Arthur KRAUSE et al., Plaintiffs,

v.

James A. RHODES, et al., Defendants,

Sindell, Lowe & Guidubaldi, A Partnership et al., Appellants,

Attorney General of Ohio, Intervenor, Appellee.

Nos. 79–3115, 79–3202.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1981.

Decided March 27, 1981.

---

James A. Lowe, Sindell, Lowe & Guidubaldi, Cleveland, Ohio, for appellants.

Sanford Jay Rosen, Rosen & Remcho, San Francisco, Cal., Nelson G. Karl, Cleveland, Ohio, David E. Engdahl, Denver, Colo., Rees Davis, Mansfield, Ohio, William J. Brown, Atty. Gen., Steven R. Keller, Columbus, Ohio, Robert Blakemore, Blakemore, Rosen & Norris, Akron, Ohio, Charles E. Brown, Crabbe, Brown, Jones, Potts & Schmidt, N. Victor Goodman and Stephen Lewis, Topper, Alloway, Goodman, DeLeone & Duffey, Columbus, Ohio, Eugene Selker, Cleveland, Ohio, Charles Shanklin, George, Greek, King, McMahon & McConnaughey, Columbus, Ohio, Bruce J. Ennis, New York, John P. Adams, Bd. of Church & Soc. United Methodist Church, Washington, D. C., Bruce T. Wick, Westlake, Ohio, Joseph Kelner, Kelner, Kelner, Stelljes & Glotzer, New York City, Fred Mandel, Mandel & Goldsmith, Cleveland, Ohio, Alfonse J. Damico, Syracuse, N. Y., John Lawson, Stephen T. Parisi, Paul S. Lefkowitz, Cleveland, Ohio, for appellee.

Burton Fulton, Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, for defendant and intervenor.

Stephen V. Bomse, San Francisco, Cal., for plaintiffs-appellees beneficiaries.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge and PHILLIPS, Senior Circuit Judge.

EDWARDS, Chief Judge.

Steven Sindell, the original counsel for 12 of the plaintiffs in the 1970 Kent State shooting cases,[1] appeals from orders entered by Judge William K. Thomas approving a settlement of this lengthy and bitterly fought litigation.

---

**1.** In these consolidated cases damages were sought by nine persons injured and the personal representatives of four persons who were killed at Kent State University on May 4, 1970. The defendants (the Governor of Ohio, the president of the university and various officers and enlisted members of the Ohio National Guard) were alleged to have "intentionally, recklessly, willfully and wantonly" caused an unnecessary deployment of the Ohio National Guard on the Kent State campus and, in the same manner, ordered the Guard members to perform allegedly illegal actions which resulted in this historic tragedy. The complaints alleged causes of action under the Civil Rights Act of 1871, 17 Stat. 13, now 42 U.S.C. § 1983 (1976).

Sindell contends that his 33⅓% contingency fee contracts for representation of these plaintiffs invalidate the limitation and allocation of attorneys' fees occasioned by the District Court's approval of a $675,000 "settlement" between the State of Ohio[2] and the litigants. As appellant Sindell's counsel states the matter:

> None of the substantive or procedural issues of the case in chief are presented here for review. Rather, this appeal challenges the authority of the District Court to have extinguished, as an integral part of the settlement, private contractual agreements between the plaintiffs and their attorneys and to have substituted therefore a "reasonable" attorney's fee, all without the benefit of any hearing, evidence or briefs whatsoever.[3]

The record in this case is a long and tortuous one. The complaints, originally filed in 1970, were dismissed by the District Court on the theory that essentially the action was against the State of Ohio and barred by the Eleventh Amendment. On appeal, this court affirmed these dismissals by a divided panel. See Krause v. Rhodes, 471 F.2d 430 (6th Cir. 1972). The United States Supreme Court, however, unanimously reversed the judgments below and remanded for trial. Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). After the first trial, the jury returned a verdict for defendants of no cause for action.

Subsequent to this adverse jury verdict, all plaintiffs and their counsel (including Steven Sindell) signed an agreement naming the American Civil Liberties Union (ACLU) as lead counsel "for purposes of all appellate proceedings in this litigation." Sanford Jay Rosen headed a team of ACLU lawyers in prosecuting the successful appeal to this court, which reversed for new trial. Krause v. Rhodes, 570 F.2d 563 (6th Cir. 1977), cert. denied, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 517 (1978). Rosen and his team also represented plaintiffs in the first four days of the second trial of this case and in the discussions which led to settlement.

This case was settled by an agreement entered into by all parties and lawyers except Sindell. The State of Ohio (not a party to this litigation) voluntarily offered to pay $675,000 in full settlement, provided that $600,000 of this sum be paid directly to plaintiffs undiluted by legal fees or expenses. Judge Thomas entered a settlement and dismissal order providing for payment of $600,000 to plaintiffs, $50,000 as payment in full to the attorneys, and $25,000 to cover out-of-pocket expenses. The ACLU and most of the other attorneys, including lead counsel Rosen, agreed with the settlement and subsequently agreed to Judge Thomas' distribution of the $50,000 attorneys' fees fund. Judge Thomas limited distribution of the $50,000 to contingent fee contract holders and apparently based the fund's allocation upon work performed prior to the first adverse jury verdict, disregarding for this purpose any of the services rendered by counsel in the successful effort to reverse that verdict and the subsequent retrial which produced the settlement agreement. Thus, law firms associated with appellant Sindell received $33,740 of the $50,000 fund, while the ACLU and the lawyers associated therewith received nothing for their services.[4]

Appellant Sindell's argument before this court is a simple contention that a contingent fee agreement is beyond the power of a federal judge to invalidate or modify on

---

2. The State of Ohio was not a party to this action.

3. Appellant Sindell was afforded two opportunities to voice his opposition to the limitation on attorneys' fees, although both such hearings occurred after entry of the settlement orders challenged here.

4. The ACLU has filed a separate "conditional appeal" (which we dismiss this day on the basis of this opinion) seeking to protect its rights to an appropriate fee in the event Sindell's present appeal succeeds in voiding the settlement. See Krause v. Rhodes, No. 79–3330 (6th Cir. March 27, 1981).

any grounds whatsoever. Judge Thomas, however, based his decision to limit attorneys' fees in these cases in part upon the trial court's traditional power to resolve fee disputes between litigants and their counsel. In this regard, he cited *Grimes v. Chrysler Corp.*, 565 F.2d 841 (2d Cir. 1977) and *American Federation of Tobacco Growers v. Allen*, 186 F.2d 590 (4th Cir. 1951).

We believe it would be helpful to an understanding of this case to incorporate Judge Thomas' discussion of the history and purpose of the settlement, contained in his opinion of February 6, 1979:

By letter dated January 16, 1979, Robert F. Howarth, Jr., President of the State Controlling Board presented to me Ohio's draft in the amount of $675,000.00.

In his letter he stated:
I am authorized to act only pursuant to Controlling Board request No. E47, as approved January 4, 1979. Enclosed herewith, please find a copy of this authorizing document, with this court's Settlement and Dismissal Order incorporated therein and attached thereto as Exhibit A.

His letter continued:
I ask that you carefully note that the subject draft is presented only under the terms of this court's Settlement and Dismissal Order upon which the Controlling Board's approval is conditioned. In other words, any distribution of these funds other than as provided in the Settlement and Dismissal Order would violate the conditions under which the enclosed draft is presented. It is certainly our understanding that Mr. Sanford J. Rosen as Trustee for distribution will be accordingly bound to these terms and conditions.

The attached Controlling Board E47 Request for transfer of the $675,000.00 Kent State Settlement Fund specified:
Attached hereto as "Exhibit A," and incorporated herein by reference, is a document entitled Settlement and Dismissal Order. As contemplated by the Order, OBM's request is conditioned upon the terms and requirements set forth therein.

These documents are attached to Order One of this court pursuant to which I delivered to Sanford J. Rosen the State of Ohio draft in the amount of $675,000.00. Order One specifically provides that Sanford J. Rosen is directed to carry out his trusteeship pursuant to this court's Order of January 4, 1979 and the letter of President Howarth.

As previously read, the order of January 4, 1979 specifies that $50,000 shall be paid in full for attorney fees and $25,000 as out-of-pocket expenses. $600,000 shall be paid to the plaintiffs as itemized in the attached list.

It was this precise breakdown and allocation of the total settlement fund of $675,000 that was presented to and approved by plaintiffs and their counsel when this court met with plaintiffs and their counsel on the morning of Wednesday, December 6, before court opened. Defendants likewise were informed of and approved the settlement and breakdown.

The same total settlement fund and the breakdown of $600,000 as itemized for each of the plaintiffs, $50,000 as payment in full for attorney fees, $25,000 as out-of-pocket expenses, was full disclosed by me to President Oliver Ocasek of the Ohio Senate and Speaker Vernon Riffe of the Ohio House of Representatives. This occurred when these legislative leaders met with me in this court house on the afternoon of December 6, 1978.

Previously informed of the contingent fee contracts of appellant Sindell and other former counsel, I had fixed the $50,000 to provide for any contingent fee claim.

Because I knew that the State of Ohio would not make payment of a settlement fund of $675,000 if the contingent fees were

charged against the fund or against any of the individual plaintiffs, I fixed $50,000 as payment in full for all attorney fees.

Without this limitation of attorney fees, there would have been no settlement of the Kent State cases by the State of Ohio. That is made clear by the express wording of the State Controlling Board request No. E47 which I have just read, as it was approved on January 4, 1979.

Under these circumstances, this court, acting in its discretion under 42 U.S.C. § 1988, as amended, allowed the plaintiffs "a reasonable attorney's fee" of $50,000.

It is appreciated that under some circumstances in a civil rights action prosecuted under section 1983, contingent fees may be charged while additional attorney fees under section 1988 would not be allowed by the court. See *Zarcone v. Perry*, 581 F.2d 1039 (2nd Cir.)

But under the present circumstances, in order to effect a settlement and to end this litigation which seemed as if it would never end, it was indispensable that this court fix attorney fees under section 1988 and that the fees so fixed should modify and supercede any contractual contingent fees of former counsel of these plaintiffs.

If to achieve the settlement it was necessary to limit attorney fees to $50,000, it is also fair under the circumstances to do this.

Undoubtedly countless hours of legal services have been performed on behalf of the plaintiffs by Steven A. Sindell and many other attorneys from the inception of this litigation through the unsuccessful first trial in late August, 1975.

But, it is also true that Steven A. Sindell did not conduct the appeal that obtained a new trial, without which there would have been no second trial and no settlement. A legal team headed by Sanford Jay Rosen represented the plaintiffs in their successful appeal. These attorneys, and not former counsel, have represented the plaintiffs through the second trial and settlement.

These foregoing circumstances make it clear that Steven A. Sindell has played no part in creating the settlement fund. I can personally attest to this fact. Yet, it was nonetheless determined by this court to reserve $50,000 of the settlement fund out of which to ratably compensate any former counsel who may have had contingent fee contracts with any of the plaintiffs.

■ Certainly, this case is unique in the annals of litigation in the United States Courts. Judge Thomas found no exact controlling precedent for the actions which he felt required to take, nor do we. Nonetheless, we feel that his approval of the "settlement" offered by the State of Ohio, conditioned specifically upon $600,000 going to the individual plaintiffs without reduction by attorneys' fees, was within his judicial discretion.

■ A federal district judge has broad equity power to supervise the collection of attorneys' fees under contingent fee contracts. As has often been stated,

> where an attorney recovers a fund in a suit under a contract with a client providing that he shall be compensated only out of the fund he creates, the court having jurisdiction of the subject matter of the suit has power to fix the attorney's compensation and direct its payment out of the fund.

*Garrett v. McRee*, 201 F.2d 250, 253 (10th Cir. 1953), *quoted in Cappel v. Adams*, 434 F.2d 1278, 1279 (5th Cir. 1970). Further, "[t]he sum determined to be a reasonable attorney's fee is within the discretion of the district court; before a reviewing court should disturb the holding there should be a clear showing that the trial judge abused his discretion." *Cappel v. Adams, supra,* at 1280. Thus, an attorney's right to contract for a contingent fee is not completely beyond judicial control.[5]

---

5. The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1976), also provided Judge Thomas discretion to "allow the prevailing party ... a *reasonable* attorney's fee as part of the costs." (Emphasis added.) While the language of § 1988 does not expressly em-

Indeed, the Code of Professional Responsibility (CPR) of the American Bar Association imposes considerable limitations upon the ability of lawyers to contract for contingent fees. *See* DR 2–106 and EC 2–20.[6] As indicated by the drafters' footnotes, the cited CPR provisions are based largely upon Canon 13 of the old ABA Canons of Professional Ethics, adopted in 1908. Canon 13 provided:

Contingent Fees.

A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, *but should always be subject to the supervision of a court, as to its reasonableness.*

(Emphasis added.)

Under the facts of this case, to allow Sindell to enforce his contingent fees to the letter would be, as the District Judge obviously agreed, totally unreasonable.[7] At the outset, had the court accepted Sindell's posi-

power a district court to limit fees derived under a private agreement between the prevailing attorney and his client, it is indicative of the extensive powers available to district judges in supervising attorneys' fees awards in civil rights cases.

**6.** DR 2–106 Fees for Legal Services
(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.[89]

[89] Cf. ABA Canon 13; *see generally* MacKinnon, Contingent Fees for Legal Services (1964) (A Report of the American Bar Foundation).
(C) A lawyer shall not enter into an arrangement for, charge, or collect a contingent fee for representing a defendant in a criminal case.
EC 2–20 Contingent fee arrangements [30] in civil cases have long been commonly accepted in the United States in proceedings to enforce claims. The historical bases of their acceptance are that (1) they often, and in a variety of circumstances, provide the only practical means by which one having a claim against another can economically afford, finance, and obtain the services of a competent lawyer to prosecute his claim, and (2) a successful prosecution of the claim produces a *res* out of which the fee can be paid. Although a lawyer generally should decline to accept employment on a contingent fee basis by one who is able to pay a reasonable fixed fee, it is not necessarily improper for a lawyer, where justified by the particular circumstances of a case, to enter into a contingent fee contract in a civil case with any client who, after being fully informed of all relevant factors, desires that arrangement. Because of the human relationships involved and the unique character of the proceedings, contingent fee arrangements in domestic relation cases are rarely justified. In administrative agency proceedings contingent fee contracts should be governed by the same consideration as in other civil cases. Public policy properly condemns contingent fee arrangements in criminal cases, largely on the ground that legal services in criminal cases do not produce a *res* with which to pay the fee.

[30] *See* ABA Canon 13; *see also* MacKinnon, Contingent Fees for Legal Services (1964) (A Report of the American Bar Foundation).
"A contract for a reasonable contingent fee where sanctioned by law is permitted by *Canon 13,* but the client must remain responsible to the lawyer for expenses advanced by the latter. 'There is to be no barter of the privilege of prosecuting a cause for gain in exchange for the promise of the attorney to prosecute at his own expense.' (Cardozo, C. J. in *Matter of Gilman,* 251 N.Y. 265, 270–271, 167 N.E. 437)" *ABA Opinion* 246 (1942).

**7.** Particularly since Sindell's firm took the "lion's share" of the $50,000 fund, despite his failure to produce any monetary benefit for plaintiffs.

tion, it would have been unable to approve the settlement and there would have been no funds to disburse in any manner. The State of Ohio had conditioned its settlement offer upon the plaintiffs' "netting" $600,-000. The State cannot have been motivated by the same reasoning which ordinarily prompts litigants to settle cases; Ohio had a stake not just in disposing of litigation but in calming the bitter conflict over this case which had raged within its borders—as well as throughout the nation. Thus, the limitations imposed on fee recoveries were absolutely essential to a just settlement of this unique case.

We acknowledge that, due to the great effort expended in obtaining and preparing for the first (and wholly unsuccessful) trial of this case, Sindell's billing on a time and material basis might equal or exceed the 33⅓% contingent fee for which he contracted. This, however, is not the only aspect to be considered in assessing the reasonableness of an attorney's fee. A contingent fee arrangement "may be such that what was in the first instance a fair contract becomes unfair in its enforcement." *In re Friedman*, 136 App.Div. 750, 121 N.Y.S. 426, 428, *aff'd* 199 N.Y. 537, 92 N.E. 1085 (1910). *See also Rodgers v. Sound of Music Co.*, 67 Misc.2d 412, 324 N.Y.S.2d 423, 425 (Sup.Ct. 1971). Clearly, however reasonable and appropriate the instant fee contracts were when signed, the situation now existing differs drastically from that which the contracting parties originally contemplated.

We wish to add that the District Court's actions here were not wholly unprecedented. In *In re Friedman, supra*, for example, the trial court (sua sponte) reduced a lawyer's contingent fee from an agreed upon 50% of the $8,000 settlement to $2,150. A New York appellate court affirmed the reduction, declaring:

> The contract between the parties was not per se fraudulent, nor evidence of improper or undue advantage. One-half of a recovery as contingent payment for

legal services may be more beneficial to the client than to the lawyer.... Nevertheless the recovery may be such that the lawyer's retention of it would be unjustified, and would expose him to the reproach of oppression and overreaching. *He is an officer of the court, and is judged as such, and technical contractual rights must yield to his duty as such officer.*

*Id.*, 121 N.Y.S. at 427–28 (emphasis added).

In *Wade v. Clemmons*, 84 Misc.2d 822, 377 N.Y.S.2d 415 (Sup.Ct.1975), an attorney demanded strict enforcement of his contingent fee contract, even though such enforcement (when coupled with other claims against the settlement fund) would have denied his client any recovery. The trial court reduced the fee, however, stating:

> In this situation, a fair contract becomes unfair in its enforcement. The lawyer's retention of his full legal fee is unjustified and exposes him to an accusation of oppression and overreaching.
>
> The court will not sit by and give its pro forma approval. It has the "power to compel attorneys to act equitably and fairly towards their clients". (*Robinson v. Rogers*, 237 N.Y. 467, 472, 143 N.E. 647, 649 [(1924)].)

*Id.*, 377 N.Y.S.2d at 420. By comparison, had Sindell succeeded in upsetting the instant settlement, these plaintiffs might well have gone totally uncompensated at a retrial.

In closing, we note that Steven Sindell failed to produce any monetary benefit for these plaintiffs. We also observe that the ACLU lawyers who obtained this settlement are receiving nothing for their services. Under these facts, the award of $33,-740 to Sindell and his present or former law firms is at least fair compensation.

It is appropriate that we now ring down the curtain on this tragic drama which so

bitterly divided our nation in the decade of the '70's.

The judgment of the District Court is affirmed.