[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Jeffrey Rohan brings this action against the defendant Leon Rosenblatt, his former attorney, to recover an allegedly unreasonable and excessive legal fee paid by Rohan to Rosenblatt. The defendant charged Rohan a one-third contingency fee to collect the proceeds of a $100,000 life insurance policy insuring his wife. The defendant denies that the $33,333.33 fee that he charged was unreasonable or excessive.
The court finds the facts as hereafter set forth. On January 24, 1991, the plaintiff's wife, Patricia Moore — Rohan, applied for a $100,000 life insurance policy to be issued by First Colony Life Insurance Company. The beneficiary was to be her husband, the plaintiff. On February 14, 1991, less than one month later, Moore-Rohan was diagnosed as having terminal lung cancer. Shortly after that, Rohan spoke with the defendant about the likelihood of First Colony paying the proceeds of the new life insurance policy. They also discussed the possibility of reinstating a Prudential life insurance policy that had lapsed.
First Colony issued its policy in March, 1991. On April 29, 1991, Moore-Rohan died. After her death, Rosenblatt represented the plaintiff with respect to both the Prudential and First Colony policies. It soon become evident that the Prudential policy could not be reinstated and Rosenblatt therefore focused his effort on the First Colony policy.
Rosenblatt told Rohan repeatedly in June that he believed suit would be necessary to collect the proceeds of the First Colony policy. He also told Rohan that the litigation would be "horrendous." Rosenblatt's beliefs about the litigation were based on the chronological facts, i.e., that Moore — Rohan was diagnosed with cancer so soon after she applied for the insurance CT Page 11352 and that she died so soon after the policy was issued. He had no factual basis for his conclusions. Neither First Colony nor Rohan's insurance agent had denied payment or indicated there would be a problem with payment.
On June 14, 1991, Rohan and Rosenblatt met and discussed a fee arrangement. The defendant asked Rohan what type of fee arrangement he wanted. Rohan initially said an hourly fee, but also said that he had no money to pay a fee on that basis. They therefore agreed to a one-third contingency fee. They did not discuss whether the contingency fee would apply if the matter was resolved without the need to file suit. Because Rosenblatt repeatedly stated that litigation was inevitable, Rohan believed filing suit would be necessary and the contingency fee was therefore appropriate. At the time the fee agreement was made, Rohan was distraught over his wife's death and under the care of a psychologist. He was worried about paying the funeral bill and saving his house from foreclosure. Rosenblatt confirmed the agreement for a contingency fee in a brief letter dated June 18, 1991. He did not ask Rohan to sign a copy of the letter.
On August 20, 1991, First Colony paid the face amount of the policy plus interest from the date of death. James Sawyer, Rohan's insurance agent, delivered the check to Rohan at his house. Happy to have the money, Rohan promptly called Rosenblatt to inform him that the policy had been paid. Rohan also asked Rosenblatt how much of a fee he owed. Rosenblatt told him it was "a lot of money, $33,333.33". Rosenblatt also told Rohan he needed the money to pay his share of the expense of remodeling his law office. Rohan deposited the insurance check and then mailed Rosenblatt a check for $33,333.33.
At the time that Rohan paid $33,333.33 to Rosenblatt, Rohan, a Hartford police officer, did not know what an appropriate attorney's fee would be under the circumstances. He trusted Rosenblatt and accepted his assurance that the fee was reasonable. Some months later Rohan had second thoughts about the amount of Rosenblatt's bill. He spoke with Sawyer and wrote to First Colony to find out how much work Rosenblatt had done. In July, 1992, he consulted a new attorney and retained him to seek the return of most of the $33,333.33 that he paid Rosenblatt. Rohan filed for fee mediation with the Connecticut Bar Association and appeared with his new counsel at the fee mediation hearing. Rosenblatt refused to appear or participate in the fee mediation. CT Page 11353
Rosenblatt never provided Rohan with a detailed bill showing the work that was done and the time that he spent, despite Rohan's requests. At trial Rosenblatt was evasive about how much time he spent to collect the First Colony policy. He stated that he met with Rohan, corresponded and spoke with Rohan, First Colony, Sawyer and Equifax, did some document review and did one to two days of research in the law library. He finally conceded during his testimony that he did not do "a lot of work" on this case and that he did not spend more than twenty-five hours on the matter.
Rohan testified that he trusted and relied on Rosenblatt and feels that Rosenblatt took advantage of him. He believes the defendant should be paid for the time he spent on the First Colony case, but that $33,333.33 is an exorbitant fee for the work that was done.
Rohan's amended complaint is set forth in three counts. The first count alleges that Rosenblatt breached his duty to Rohan in several respects, including by deceiving Rohan into thinking that $33,333.333 was a reasonable fee under the circumstances and by deceiving Rohan as to the true extent of his efforts to obtain the insurance proceeds. He further alleges that Rosenblatt knew or should have known that First Colony was treating the claim as a routime matter.
An attorney-client relationship imposes a fiduciary duty on the attorney. Beverly Hills Concepts, Inc. v. Schatz Schatz,Ribicoff Kotkin, 247 Conn. 48, 56 (1998). This fiduciary relationship is characterized by a unique degree of trust and confidence between the parties; the attorney has superior knowledge and expertise and has the duty to represent the interests of his or her client. Id. An attorney must have personal integrity and responsibility and show a high degree of fidelity and good faith toward the client. Andrews v. Gorby,237 Conn. 12, 20 (1996)
The attorney as fiduciary bears a two fold burden in dealings with the client. First, the attorney bears the burden of proving fair dealing with the client. Secondly, the attorney bears a higher burden of proof than the customary standard; the attorney must prove fair dealing with the client by clear and convincing evidence. Id., 21; Dunham v. Dunham, 204 Conn. 303, 322-3 (1987). Our courts have always given close scrutiny to attorney-client CT Page 11354 relationships. Andrews v. Gorby, supra, 237 Conn. 21. The superior position of the fiduciary provides opportunity for abuse of the confidence placed in him or her. Dunham v. Dunham, supra,204 Conn. 322. Because a distressed plaintiff may yield too uneasily to unfair demands from his or her attorney, courts will look closely at a contract for contingent fees and will declare it void if the compensation is unfair or excessive. Gruskay v.Simenauskas, 107 Conn. 380, 386 (1928).
Based on these cases, the threshold issue before the court is whether the defendant has proven by clear and convincing evidence that he dealt fairly with Rohan with respect to the attorney's fee that he charged. The court finds that he has not met his burden of proof.
A contingent fee is appropriate only where there is a genuine risk whether the attorney will be able to bring an asset into the client's possession. ABA/BNA Lawyers' Manual on professional Conduct, § 41:901, No. 147, p. 3. Before an attorney enters into a contingency fee agreement with a client, the client needs to be fully informed as to the degree of risk involved. Committee onLegal Ethics v. Tatterson, 352 S.E.2d 107, 113 (W.Va. 1986). If there is no significant risk with regard to the representation, a contingency fee agreement is not appropriate. Id., 113-114. "The clearest case where there would be an absence of real risk would be a case in which an attorney attempts to collect from a client a supposedly contingent fee for obtaining insurance proceeds for a client when there is no indication that the insurer will resistthe claim." (Emphasis added), Id., 114. Attorneys should be careful about charging contingent fees for the collection of insurance proceeds because contingent fees can be unreasonably large when it takes little effort on the attorney's part to collect the policy proceeds. ABA/ENA Lawyers' Manual on professional Conduct, § 41:919, No. 152, p. 3. Just such a situation occurred here.
The circumstances as they actually existed in June, 1991 did not warrant a contingency fee agreement and a contingent fee agreement was not reasonable at that time. Rosenblatt's belief that "horrendous" litigation would be necessary was based only on the chronology of events relating to the issuance of the policy, not on any objective facts. First Colony never indicated to Rosenblatt or Rohan that it would resist payment of the policy. No such indication was given by Equifax or Sawyer either. Therefore, in June, 1991, when the parties agreed to a one-third CT Page 11355 contingency fee agreement, there was not a significant risk that the policy would not be paid and a contingency fee agreement was not appropriate.
Rosenblatt claims that an Equifax form stated that the claim was contestable. An Equifax claim investigation report prepared in June, 1991, does read "Type Report: Death Claim-Contestable." However, there was no evidence that Rosenblatt saw this form or even knew of it in June, 1991. Moreover, the form is not evidence that the claim would be contested, only that the contestability period in the policy had not expired and the policy therefore was "contestable."
The parties disagree as to whether, in determining the reasonableness of the fee paid the defendant, the court is limited to the circumstances that existed at the time the agreement was made or whether the court can consider subsequent events up through the conclusion of the representation. If the court is limited to the facts at the time the agreement was made, the court has found the fee unreasonable for the reasons set forth above.
Several cases, however, hold that it is appropriate to consider the reasonableness of a fee in light of events up through the conclusion of the representation. In McKenzieConstruction, Inc. v. Maynard, 758 F.2d 97 (3rd Cir. 1985) the Court of Appeals held that the trial court, which was determining the reasonableness of a contingency fee, erroneously limited its inquiry to consideration of the circumstances at the time the agreement was entered into. Id., 101. The Court pointed out that events may occur after the agreement was made that demonstrate that a contingent fee agreement that appeared fair or reasonable when entered into became unfair in light of subsequent events. Id.; Krause v. Rhodes, 640 F.2d 214, 220 (6th Cir. 1981) cert. denied, 454 U.S. 836 (1981). "[I]n most jurisdictions the reasonableness of a contingent fee must be judged not only under the circumstances that prevailed at the time the fee agreement was made but also in light of events that occurred subsequently." ABA/BNA Lawyers' Manual on professional Conduct, § 41:911, No. 147, P. 13.
This issue does not appear to have been decided by our Connecticut appellate courts. This court is persuaded, however, that the majority rule, endorsed in the McKenzie case, is the better rule. Under the circumstances here, all of the events CT Page 11356 relating to the reasonableness of a contingent fee, including the events subsequent to the making of the agreement, should be considered in determining the reasonableness of that fee. Indeed, given that the "result obtained" and the "time and labor required" to perform the legal service are factors to be considered by the court under Rule 1.5 of the Rules of Professional Conduct, and those factors can only be determined at the conclusion of the representation, the court believes it necessarily must consider facts subsequent to the making of the contingency fee agreement.
The circumstances when the representation came to an end in August, 1991 demonstrate that a contingency fee agreement was unreasonable. An analysis of the factors set forth in Rule 1.5 shows that a fee of $33,333.33 was clearly unreasonable. The result obtained, payment of the policy, although a good one, could have been reasonably expected in that First Colony had never indicated that it would not pay the policy. After the brief investigation by Equifax, First Colony promptly disbursed the policy proceeds. Rosenblatt's time and labor were not significant, a maximum of twenty-five hours of fairly routine work consisting primarily of correspondence and phone calls. The skill required was minimal; there were no novel or difficult questions involved. The matter did not require special skill or experience; Rosenblatt is primarily a labor lawyer, but this was not a labor matter. With respect to the fee customarily charged in the locality for similar legal services, Attorney James Kernan testified that based on all the circumstances a reasonable fee for these services would be a fee based on an hourly rate or a contingent fee of only two to three percent.
The defendant presented the testimony of Attorney John D. Moore with respect to the reasonableness of the fee charged Rohan. Moore has taught legal profession classes at the University of Connecticut Law School and has been a member since 1990 of the Committee on Professional Ethics of the Connecticut Bar Association. Moore testified that the $33,333.33 contingent fee charged Rohan was not a breach of any duty owed by Rosenblatt to Rohan and was "reasonable under all the circumstances" as they existed when the agreement was made. He referred to Rule 1.5 of the Rules of Professional Conduct, and reviewed some of the factors in the Rule.
Moore failed, however, to consider whether there was in fact a significant risk of litigation at the time when the contingency CT Page 11357 fee was agreed upon and further failed to consider events that occurred after the fee agreement was entered into. He failed to explain his refusal to consider events after the fee agreement was made in light of the fact that "the time and labor required" for the matter and "the results obtained," factors to be considered under Rule 1.5, could not be determined until after the representation was concluded. The court did not find his testimony persuasive.
The defendant has failed to sustain his burden of showing by clear and convincing evidence that he dealt fairly with Rohan in charging him a fee of $33,333.33 for the uncontested collection of the proceeds of the First Colony life insurance policy. The court finds for the plaintiff on the first count of his complaint.
In his post-trial brief, the defendant objected strenuously to the plaintiff's characterization of the first count of the complaint as a claim to recover an excessive attorney's fee. He asserts that Rohan's attorney always referred to the first count as a legal malpractice claim and the defendant was therefore misled. There is no merit to this contention. The term "legal malpractice" has been found broad enough to encompass a claim for an excessive attorney's fee based on the breach of the attorney's ethical duties of good faith and fidelity. Schultz v. Harney,33 Cal.Rptr.2d 276 (Cal.App. 2d Dist. 1994) Moreover, a review of the actual allegations of the first count, which is the most important factor in determining the cause of action pleaded, reveals an allegation in paragraph ten of a breach of the defendant's duty as the plaintiff's attorney. Virtually all of the sub-paragraphs of paragraph ten relate to the fee charged by the defendant. Nowhere is there any allegation that the defendant failed to meet the applicable standard of care in rendering legal services to the plaintiff. The defendant should not have been misled; the first count clearly sets forth a claim for an excessive fee.
The defendant also claims that the plaintiff has sued the wrong party, contending that the fee was paid to the firm of Rosenblatt and Mills. There was no evidence that payment was made to the firm. Moreover, the plaintiff's fee agreement was with Rosenblatt only and he credibly testified that it was Rosenblatt he paid.
In the second count the plaintiff alleges that the CT Page 11358 defendant's actions constitute a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), General Statutes § 42-110a
et seq. Among the allegations of this count are claims that Rosenblatt used his position as Rohan' s attorney to a) charge an unreasonable fee; and b) deceive the plaintiff as to the reasonable nature of his fee.
"The purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, and whether a practice is unfair depends on the finding of a violation of an identifiable public policy." Krawiec v. Blake Manor DevelopmentCorp., 26 Conn. App. 601, 607 (1992). It is well established that CUTPA applies to the business or "entrepreneurial" practices of lawyers toward clients or prospective clients. Heslin v.Connecticut Law Clinic of Trantolo Trantolo, 190 Conn. 510,520-521 (1983); Larsen Chelsey Realty Co. v. Laresen,232 Conn. 480, 496 n. 19 (1995).
Our Supreme Court has adopted the so-called "cigarette rule" used by the Federal Trade Commission to determine whether an act or practice is unfair within the meaning of CUTPA. Normand JosefEnterprises, Inc. v. Connecticut National Bank, 230 Conn. 486,522 (1994). The rule requires an evaluation of three considerations: (1) whether the act or practice offends public policy as established in statutes or common law; (2) whether it is "immoral, unethical, oppressive or unscrupulous;" and (3) whether it causes substantial injury to consumers, competitors or others engaged in business. Id. It is not necessary that all three criteria be satisfied. Cheshire Mortgage Service, Inc. v.Montes, 223 Conn. 80, 106 (1992)
The defendant contends that a single incident cannot give rise to a CUTPA claim, citing, inter alia, Quimby v. KimberlyClark, 28 Conn. App. 660, 672 (1992). In Quimby the issue was whether the plaintiff sufficiently alleged a violation of the Connecticut Unfair Insurance Practices Act, ("CUIPA"), General Statutes § 38a-815 et seq., as well as a CUTPA violation. CUIPA requires the actionable conduct to be a general business practice as defined in General Statutes § 38a-816 (6) and the case is therefore distinguishable. Moreover, CUTPA specifically provides for a cause of action based on a single act. "Any person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b may bring an action . . ." (Emphasis added.) General Statutes § 42-110g(a). Also, CUTPA provisions are CT Page 11359 remedial and should be liberally construed. General Statutes §42-110b(d)
The facts in this case satisfy all three components of the cigarette rule. Rosenblatt's actions in charging an unreasonable fee and deceiving Rohan as to its unreasonableness offend public policy as set forth in the common law regarding the attorney-client relationship. The common law establishes that Rosenblatt owed Rohan a fiduciary duty. He was required to show a high degree of fidelity to Rohan and to deal with him fairly, all as set forth in the common law cases set forth earlier in this decision. Despite these obligations to Rohan, Rosenblatt overreached and violated the trust Rohan had in him by charging an excessive fee and assuring Rohan it was reasonable. The court finds that the defendant's actions offend public policy.
Rosenblatt's actions furthermore were unethical and oppressive. He charged a fee that was not reasonable, in violation of Rule 1.5 of the Rules of Professional Conduct, and he took advantage of Rohan, his client, for his own personal financial gain. Finally, Rosenblatt's actions caused substantial injury to Rohan, a person of modest means who has been deprived at all times of the significant amount of money, $33,333.33, which he paid Rosenblatt in 1991 and which Rosenblatt has failed to refund.
The plaintiff has established the defendant's violation of CUTPA. The Court will enter judgment on behalf of the plaintiff for damages of $33,333.33 at the hearing hereafter described. (The defendant has filed no counterclaim for the quantum meruit value of his services.) It is not necessary to consider the third count of the plaintiff's complaint, which seeks the same relief as the first two counts.
The plaintiff also seeks an award of punitive damages pursuant to General Statutes § 42-110g(a) and attorney's fees pursuant to General Statutes § 42-110g(d). Awards of punitive damages and attorney's fees under CUTPA are discretionary with the court. Gargano v. Heyman, 203 Conn. 616, 622 (1987). An award of punitive damages must be based on an intentional and wanton violation of the rights of others or on reckless indifference to those rights. Id. With respect to attorney's fees the Appellate Court has indicated that Johnson v. Georgia Highway Express.Inc., 488 F.2d 714, 717-719 (5 Cir. 1974) sets forth the factors to be considered by the trial court in determining the amount of CT Page 11360 attorneys' fees to be awarded under CUTPA. Hernandez v. MontereyVillage Associates, 24 Conn. App. 517, n. 1 (1991)
At the outset of trial, the parties agreed with the court's suggestion to defer the amount of any punitive damages or attorney's fees to be awarded until there was a ruling on the merits of the case. The court will hear argument from the parties on these issues at a supplemental hearing to be held on Wednesday, September 1, 1999, at 2:00 p. m.
Finally, the court notes that on April 15, 1997, the plaintiff filed an offer of judgment for $30,000 under General Statutes § 52-192a. The plaintiff will be entitled, therefore, to interest at the rate of 12% per annum from April 15, 1997 until September 1, 1999 on all amounts awarded. Gillis v. Gillis,21 Conn. App. 549, 554-555 (1990)
Vertefeuille, J.