Michael Louis CRISTINI, Plaintiff,

v.

CITY OF WARREN, Warren Police Department, Macomb County, Macomb County Prosecutor, Alan Warnick, and Alice Ingles, Guardian for Donald Ingles, in his Individual and Official Capacities, Defendants.

Case No. 07–11141.

United States District Court, E.D. Michigan, Southern Division.

Signed July 7, 2014.

666

Dennis A. Dettmer, Dettmer & Dezsi, Michael R. Dezsi, Paul W. Broschay, Thomas M. Lizza, Detroit, MI, for Plaintiff.

Jami E. Leach, John J. Gillooly, Detroit, MI, Michael S. Bogren, Plunkett & Cooney, Kalamazoo, MI, for Defendants.

### OPINION AND ORDER ON MOTIONS TO DETERMINE ATTORNEY'S LIEN

DAVID M. LAWSON, District Judge.

Before the Court are cross motions filed by lawyers who represented plaintiff Michael Cristini at one time or another seeking a share of the attorney's fee generated by the settlement in this civil rights case. Cristini brought this lawsuit against the City of Warren, certain police detectives, and others after he was wrongfully convicted of rape. The issues raised by the motions parallel those in the related case involving Jeffrey Moldowan, who was charged in state court, convicted, and later exonerated along with Cristini. As in the Moldowan case, Cristini hired attorney Dennis Detmer to represent him. Detmer filed the case and conducted extensive work for about two-and-a-half years before he retired—temporarily, as it turns out. Detmer referred the Moldowan and Cristini cases to attorney Thomas Lizza, who was working at the time at the firm of Fieger, Fieger, Kenney & Giroux, P.C. ("the Fieger Firm"). The Feiger Firm signed a contingent fee agreement with Cristini, and in a separate agreement promised to pay Detmer a one-third referral fee. And as in the Moldowan case, Cristini fired the Feiger Firm and rehired Detmer to finish his case, along with attorneys Lizza, Paul Broschay, and Michael Deszi, who by then had left the Feiger Firm. Feiger was substituted out of the case and asserted a lien for fees and costs. It appears that the coasts have been reimbursed.

The Feiger Firm argues here, as it did in the Moldowan case, that it is entitled to the lion's share of the attorney's fee from the $1.5 million settlement. It repeats the arguments made in *Moldowan* and reject-

ed earlier by this Court in that case, which was affirmed by the Sixth Circuit. *Moldowan v. City of Warren*, 559 Fed.Appx. 435 (6th Cir.2014). Predictably, the outcome here will be the same: the Feiger Firm will received a share of the fee based on *quantum meruit*, calculated using the lodestar method approved by the applicable Michigan cases. Presumably anticipating this outcome, the Feiger Firm has come up with an "estimate" of the amount of work performed on the Cristini file while it was at that firm. The Court heard testimony on that calculation from the Feiger Firm's witness and finds it unreliable. The better evidence of the work performed on that file while it was essentially parked at the Feiger Firm comes from the attorneys who actually did the work, who are the same lawyers who finished the job: Dettmer and the lawyers who worked on the case after they left the Feiger Firm.

## I.

The case arises out of Jeffrey Moldowan's and Michael Cristini's convictions for rape and kidnaping. Both convictions were overturned and both Moldowan and Cristini were subsequently retried and acquitted of all charges. In approximately May 2004, Moldowan and Cristini retained Dennis Dettmer to file a civil rights lawsuit and signed a contingent fee agreement with him. Dettmer filed a complaint against the City of Warren and Detective Ingles on March 15, 2007, among others, alleging that the defendants withheld exculpatory evidence and engaged in malicious prosecution.

Dettmer represented Cristini from approximately May 2004 until January 2009 when he (temporarily) retired from the practice of law. During that time, Dettmer handled all of the discovery in the Moldowan and Cristini cases, which were conducted jointly for a period of time.

Dettmer also resisted the defendants' motions for summary judgment in *Moldowan* and filed appellate briefs in the Sixth Circuit after the Warren defendants and defendant Alan Warnick sought interlocutory review on their qualified immunity claims. Discovery, pleadings, correspondence, and research in the two cases filled 35 banker boxes. Dettmer says he spent more than $50,000 in expenses litigating *Cristini* and *Moldowan* during that period.

Before retiring, Dettmer referred the *Cristini* and *Moldowan* cases to Thomas Lizza, an attorney then employed by the Feiger Firm. Dettmer and Lizza signed a referral agreement in which Dettmer agreed to a twenty-five percent referral fee for the Cristini case and reimbursement of all his costs. Dettmer confirmed the referral in a January 17, 2009 letter to Cristini and informed Cristini that the Feiger Firm would ask him to sign a new fee agreement. Cristini signed a contingency fee contract with the Feiger Firm on April 24, 2009, in which he agreed that the Feiger Firm would receive one-third of the net recovery. Paragraph 11 of the contingency fee agreement included this language:

In the event the Firm is discharged by the Client(s) without cause or in the event that the Firm terminates its services due to some occurrence which is not the fault of the Firm's [sic], the contingency fee portion of ths [sic] agreement will be held for naught and that the Firm will be entitled to a fee based on quantum meruit. It is specifically agreed by the Client(s) that the Firm shall have a lien against any sum recovered to the extent of said costs or expenses as indicated in Paragraph 4 herein which are incurred by the Firm, and that said lien is to be granted a preference, to the extent permitted by law, over any other liens or obligations

which may be satisfied from said recovery.

Contract for Legal Representation, dkt. # 203–6, at 2.

In January 2009, Lizza replaced Dettmer as counsel of record, and on February 19, 2009, Paul Broschay filed a notice of appearance. Soon thereafter, the City of Warren defendants filed a motion to stay *Cristini* pending the Sixth Circuit decision on the interlocutory appeals in *Moldowan*. Judge Anna Diggs Taylor, to whom the case was assigned originally, granted the defendants' motion to stay the case on February 24, 2009.

On October 25, 2010, Lizza filed a motion to lift the stay after the Sixth Circuit issued its decision in *Moldowan*, which Judge Taylor granted on November 18, 2010. On November 22, 2010, the case was reassigned to the undersigned after Judge Taylor retired. The Court held a status conference on January 11, 2011, which Lizza and Broschay attended on behalf of Cristini. There was no activity in the case between January and May 2011 (except for a stipulation dismissing defendant Maureen Fournier), because Cristini was being prosecuted in another criminal case, and the parties wanted to await the outcome, which could have shed light on whether the present case was worth pursuing. Cristini was acquitted in that case, and this lawsuit emerged from its dormancy when the Court held a status conference on May 12, 2011.

In that same month, Cristini discharged the Fieger Firm after many of their litigation attorneys (including Lizza, Broschay, and Michael Deszi) decided to leave the firm. Cristini then re-engaged the services of Dettmer, who agreed to come out of retirement to assist with the Cristini litigation. Dettmer retained the assistance of Broschay, Lizza, and Dezsi, who had all left the Fieger Firm by that time.

The Court substituted Dennis Dettmer and the law firm Dennis A. Dettmer, PLLC as counsel of record in the place of the Fieger Firm on June 9, 2011; Broschay and Dezsi filed notices of appearance on behalf of Cristini on June 29, 2011.

The Fieger Firm filed its notice of lien on June 20, 2011.

The activity for the plaintiff in this file after the Fieger Firm's exit included responses to the defendants' motions for summary judgment, appellate briefs in the Sixth Circuit in response to the defendants' interlocutory appeals, retention of experts, further discovery, preparation for trial, and participation in mediation and settlement conferences with the Court.

On June 11, 2012, plaintiff settled his claims against defendants Macomb County and the Macomb County Prosecutor, and the Court entered an order dismissing the case against them with prejudice. Likewise, the plaintiff reached a settlement with defendant Warnick, reflected in a consent judgment entered on December 7, 2012.

On December 27, 2013, the parties settled the case with the Warren defendants. The Court dismissed the case with prejudice, and retained jurisdiction to adjudicate the disputed over the amount of the attorney's lien filed by the Fieger Firm.

On January 10, 2014, the plaintiff filed a motion to determine the lien [dkt. # 183] and, on February 6, 2014, the Fieger Firm filed its own motion to determine the lien [dkt. # 203]. The Court took testimony and heard argument on those motions on May 15, 2014.

## II.

The law on attorney fees is well-settled in contingent fee cases in which an attorney is discharged before completing his services. "[T]he law creates a lien of

an attorney upon the judgment or fund resulting from his services." *Ambrose v. Detroit Edison Co.*, 65 Mich.App. 484, 487–88, 237 N.W.2d 520 (1975). If "an attorney's employment is prematurely terminated before completing services contracted for under a contingency fee agreement, the attorney is entitled to compensation for the reasonable value of his services on the basis of quantum meruit, and not on the basis of the contract, provided that his discharge was wrongful or his withdrawal was for good cause." *Plunkett & Cooney, P.C. v. Capitol Bancorp Ltd.*, 212 Mich. App. 325, 329–30, 536 N.W.2d 886, 889 (1995) (citing *Morris v. Detroit*, 189 Mich. App. 271, 278, 472 N.W.2d 43 (1991)). The phrase *quantum meruit* means " 'as much as deserved.' " *Keywell & Rosenfeld v. Bithell*, 254 Mich.App. 300, 359, 657 N.W.2d 759, 792 (2002) (quoting Black's Law Dictionary 1243 (6th ed.1990)).

■ The Supreme Court has held that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Likewise, the Sixth Circuit has recognized that "[a]n attorney who has been wrongfully discharged by his client in Michigan is entitled to *quantum meruit* recovery, based on the number of hours worked multiplied by a reasonable hourly rate." *Dean v. Holiday Inns, Inc.*, 860 F.2d 670, 672 (6th Cir.1988) (citing *Ambrose v. Detroit Edison Co.*, 65 Mich.App. 484, 237 N.W.2d 520 (1975)). This approach, "also known as the 'lodestar' approach, includes most, if not all, of the factors relevant to determining a reasonable attorney's fee." *Glass v. Secretary of HHS*, 822 F.2d 19, 21 (6th Cir.1987) (citing *Coulter v. State of Tennessee*, 805 F.2d 146, 149 (6th Cir.1986)).

■ After the lodestar is calculated, the fee may be adjusted in consideration of a number of factors, including "(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client." *Crawley v. Schick*, 48 Mich.App. 728, 737, 211 N.W.2d 217 (1973). A "trial court may also properly consider that the attorney originally agreed to render services on a contingency basis" because "[s]uch a consideration would allow the court to consider the degree of risk undertaken by an attorney who was prematurely discharged." *Reynolds v. Polen*, 222 Mich.App. 20, 29, 564 N.W.2d 467, 472 (1997). Those factors are not exclusive and "there is no precise formula for assessing the reasonableness of an attorney's fee." *Morris v. City of Detroit*, 189 Mich.App. 271, 278, 472 N.W.2d 43, 47 (1991). A "federal district judge has broad equity power to supervise the collection of attorneys' fees under contingent fee contracts." *Krause v. Rhodes*, 640 F.2d 214, 218 (6th Cir.1981). Similarly, Michigan courts have held that "a trial court is in the best position to assess an attorney's contribution to a case because trial courts are aware of the strengths and weaknesses of cases before them, the time and effort expended by the attorneys, and changes in the parties' leverage resulting from changes in counsel (e.g., due to attorneys' skill or reputation)." *Polen*, 222 Mich. App. at 30, 564 N.W.2d 467 at 472. The Sixth Circuit will "usually sustain a district court's award and division of attorneys' fees absent an abuse of discretion." *Dean*, 860 F.2d at 672 (citing *Krause v. Rhodes*, 640 F.2d at 218).

■ The attorney's fee resulting from the various settlements and after

payment of expenses is about $480,000. The Feiger Firm advances several theories to support its belief that it deserves forty-percent of the net one-third attorney fee from the settlement in this case, but most of them have been rejected by this Court and the court of appeals in the parallel *Moldowan* litigation. First, the Feiger Firm argues that the Court should not look to the lodestar method for calculating its fractional share of the fee, insisting that the Feiger Firm should have the option of electing a fixed dollar amount based on a percentage of its work. But the authority it cites for that method of distribution is thin at best, consisting of a footnote reference in *Ambrose* to *Paolillo v. American Export Isbrandtsen Lines, Inc.*, 305 F.Supp. 250 (S.D.N.Y.1969), a readily distinguishable case. Moreover, as the Sixth Circuit noted, "neither *Ambrose* nor any other Michigan case cited by Fieger adopts this standard...." *Moldowan*, 559 Fed.Appx. at 437. There is simply no support for the proposition that the Feiger Firm is entitled to choose how the Court calculates attorney fees. That decision "rests in the sound discretion of the trial court" and the trial court alone. *Jones v. Continental Corp.*, 789 F.2d 1225, 1229 (6th Cir.1986); *Chisnell v. Chisnell*, 99 Mich.App. 311, 316, 297 N.W.2d 909 (1980).

Second, the Feiger Firm's argument that "extraordinary circumstances" exist in this case is based on a faulty premise. The Feiger Firm urges the Court to adopt the approach used in *Morris v. City of Detroit*, where the state court determined that the discharged attorney was entitled to the "lion's share" of the one-third contingent fee recovered by the successor attorney because the discharged attorney performed nearly all of the work for which he had been retained. *Id.* at 189 Mich. App. at 279, 472 N.W.2d at 48. But Feiger's argument assumes that he is the beneficiary of all of Dettmer's work in the file

before the initial referral, which is simply not the case. The referral contract does not contain language assigning the value of Dettmer's pre-referral work to the Feiger Firm. It states only that Dettmer "agreed to a 1/3 referral fee," meaning that Mr. Dettmer would have been entitled to one-third of the Feiger Firm's contingent fee if the Feiger Firm fulfilled its responsibilities in the case. *Ibid.; see also Moldowan*, 559 Fed.Appx. at 437 ("Contrary to the firm's suggestion, the Dettmer–Fieger Referral lacks language assigning the value of Dettmer's pre-referral work."). Feiger is not entitled to credit for Dettmer's work.

Third, the Feiger Firm's argument based on calendar days ignores the actual activity in the case. Feiger believes that it would be appropriate to compensate it with forty percent of the net one-third attorney fee from the settlement in this case because it represented Cristini for more than forty percent of the total calendar days dedicated to litigating the dispute. But calculating *quantum meruit* based on calendar days fails to account for the attorneys' substantive efforts in the case. Current counsel for Cristini conducted nearly all of the discovery and investigation in the case, filed responses to the defendants' motions for summary judgment, filed appellate briefs in the Sixth Circuit in response to the defendants' interlocutory appeals, retained experts, prepared for trial, and participated in facilitation and settlement conferences with the Court. No dispositive motions were filed during the entire period that the Feiger Firm represented Cristini and the Court did not hold any hearings, except for two status conferences. Nor has the Feiger Firm identified any substantive work completed on the case when it was lodged at that firm, except for correspondence with Cristini's lawyer on his criminal case and

Lawsuit Financial, the institution funding his criminal trial. The sum of the Fieger Firm's participation in the case consisted of attending two status conferences, exchanging emails, and corresponding with Cristini's criminal attorney.

The Fieger Firm argues that *Bailey v. Nyloncraft, Inc.*, Case No. 11–14199, 2013 WL 2149144 (E.D.Mich. May 16, 2013), provides support for a percentage-based approach. It does not. The district court applied a percentage-based approach to calculating *quantum meruit* in that case for two reasons. *First*, the court found that an hours-worked-times-hourly-rate approach was inappropriate because it would represent only a fraction of the total hours worked for either side. *Id.* at \*2. *Second*, the court found that relying on the hours worked would be inaccurate because both sides failed to keep track of their hours, leaving both parties to "reconstruct" the hours they worked. *Ibid.* Those concerns are not present here.

Although neither party contemporaneously documented the number of hours they worked, current counsel for the plaintiff accurately reconstructed the activity in the case during the time period that the Fieger Firm represented Cristini. Such reconstruction is made easier because the case was stayed from February 2009, a month after the Fieger Firm agreed to represent Cristini, until November 2010, after which it remained essentially dormant until Cristini discharged the Fieger Firm. Because the Fieger Firm performed only limited work on the case during the two years it represented Cristini, there is no serious concern that the hours-worked-times-hourly-rate approach would underestimate the total number of hours that the Fieger Firm dedicated to the case.

None of the Fieger Firm's proposed alternate approaches for calculating its fair share makes sense or is supported by ap-

plicable law. That brings us back to the lodestar. Both sides submitted affidavits, but the Fieger Firm insisted on an evidentiary hearing to explicate the ciphering. The Court granted the request, and two witnesses testified: Thomas Lizza and Michaelene Sowinski, a paralegal-turned-attorney at the Fieger Firm. Ms. Sowinski testified that she was assigned the task of searching the firm's records to attempt a reconstruction of the time spent on the file by the departed lawyers while the case was at the firm. She asserted that she found work performed by Lizza on the file that was not reflected in his affidavit, although she admitted that her reconstruction was based on estimations, application of minimum time charges, and ultimately speculation. Her approach was shambolic at best, and her estimates are bloated.

Lizza explained, as he stated in his affidavit, that over the 30 months that the *Moldowan* and *Cristini* files were at the Fieger Firm, *Moldowan* was pending on appeal for 20 months and *Cristini* was stayed for most of that time.

The Court must concluded that the Fieger Firm's offerings are not credible; it wildly inflates the amount of time dedicated to litigating the *Cristini* case. For instance, the Fieger Firm indicates that it spent two hours preparing and filing its January 30, 2009 notice of substitution of attorneys and Thomas Lizza's appearance. Such routine filings do not require hours of effort. The Fieger Firm also documents over twelve hours spent reviewing the Court's notices to appear (e.g., one hour on January 12, 2011), minute entries (e.g., one hour on May 12, 2011), parties' notices of appearance (e.g., one-half hour reviewing Peter W. Peacock's notice of appearance on May 12, 2011), emails from the Court (e.g., half-hour January 10, 2011), and two-sentence Court orders (e.g., one hour reviewing the Court's two-sentence order

lifting the stay on November 18, 2010 and one hour reviewing the Court's two-sentence order reassigning the case on November 22, 2010). It is one thing to claim credit for all the work attributable to the law firm, but it is quite another to rely on a chimerical invention. On February 24, 2009, the Fieger Firm even maintains that it spent twenty-five minutes reviewing the Court's order staying the case even though the Court entered the order over a year later. Because these inflated time estimates undermine the Fieger Firm's credibility, the Court ascribes little weight to them.

■ Moreover, as mentioned above, the Fieger Firm's affidavits and time estimates are not based on first-hand knowledge. Instead, Fieger directed Sowinski, an associate attorney who never worked on the case, to review the physical file, the Court's docket, the firm's computer files, and emails to estimate the work performed on the case when the Fieger Firm represented Cristini. Her reconstruction contains tasks that Lizza asserts never occurred, such as seven hours reviewing the Cristini file. Because Lizza and Broschay actually represented Cristini when they worked at the Fieger Firm, they are in a better position to reconstruct their activities and to estimate the hours they spent working on the case than Sowinski. Based on Lizza's and Broschay's affidavits, the Court credits the Fieger Firm with fifteen hours.

■ The second component of the *quantum meruit* formula is the hourly rate. *Dean*, 860 F.2d at 672. Generally, a reasonable hourly rate is calculated by reference to the prevailing market rates in the relevant community. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 618 (6th Cir.2007). The plaintiff's current lawyers originally asked the Court to calculate the Fieger Firm's lien based on a rate of $600 per hour. Pl.'s Mot, dkt. # 183, at 12. However, after reviewing the Fieger Firm's motion, the current lawyers suggested that a rate of $425 per hour would be more appropriate and consistent with the Michigan State Bar Association's survey of practitioners. According to that survey, a rate of $425 per hour is equivalent to an attorney in the 95th percentile of hourly billing rates with 26 to 30 years of experience.

By contrast, the Fieger Firm argues that the Court should use the $600 hourly rate because that is what was used in *Moldowan* and there is no good reason for the Court to deviate from the rate it applied there. The Court applied a $600 hourly rate in *Moldowan* because the parties agreed to it, which is not the case here. Nonetheless, that rate can be justified, and the current lawyers originally suggested it. Therefore, that is the rate the Court will use.

The lodestar formula yields the amount of $9,000.

■ But the lodestar could be adjusted based on the *Crawley* factors and other relevant information. The Fieger Firm argues that the Court should consider that it agreed to represent Cristini on a contingent fee basis. That is relevant because "[s]uch a consideration [allows] the court to consider the degree of risk undertaken by an attorney who was prematurely discharged." *Polen*, 222 Mich.App. at 29, 564 N.W.2d at 472. The Fieger Firm argues that the Court should adjust its fees upward based on Dettmer's labor, efforts, and risk, not its own. But, as discussed already, the referral agreement does not contain language assigning the value of Dettmer's pre-referral work to the Fieger Firm.

Nor do any other factors favor adjusting the Fieger Firm's fees upwards. The docket entries show only twelve activities during the entire period that the Fieger Firm represented Mr. Cristini. Dkt. # 67–79. The nature of the work performed during that period was neither novel nor difficult: two status conferences were scheduled, emails were exchanged, and Mr. Lizza corresponded with Mr. Cristini's criminal attorney. Instead, the plaintiff's current attorneys expended the "lion's share" of the skill, time, and labor litigating the case and reaching a settlement. Although the Fieger Firm represented Cristini for more than two years based on the calendar, not much occurred on the file during that time. An accurate apportionment of the attorney fees must reflect the Fieger Firm's limited contribution toward the settlement.

### III.

Based on the foregoing, the Court finds that the Fieger Firm is entitled to the sum of $9,000 to discharge its attorney's lien, which is "as much as deserved," *Keywell & Rosenfeld*, 254 Mich.App. at 359, 657 N.W.2d at 792, for the work it performed on the case.

Accordingly, it is **ORDERED** that the motions to determine the attorney's lien [dkt. # 183, 203] are **GRANTED IN PART.**

It is further **ORDERED** that the attorney's lien is determined in favor of the law firm of Fieger, Fieger, Kenney & Giroux, P.C. in the amount of $9,000, which will be paid from the trust account of attorney Dennis Dettmer in full satisfaction of the attorney's lien.